UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MISSOURI
EASTERN DIVISION

| | |
|---|---|
| IN THE MATTER OF AN APPLICATION ) <br> OF THE UNITED STATES OF AMERICA ) <br> FOR A WARRANT TO OBTAIN ) <br> RECORDS, LOCATION INFORMATION, ) <br> INCLUDING PRECISION LOCATION ) <br> INFORMATION, CELL SITE ) <br> INFORMATION, AND OTHER ) <br> SIGNALING INFORMATION ) <br> ASSOCIATED WITH THE CELLULAR ) <br> TELEPHONE HAVING THE NUMBERS ) <br> (314) 249-2499. ) | No. 4: 16MJ01344 JMB <br><br> **FILED UNDER SEAL** |

## AFFIDAVIT FOR SECOND EXTENSION

Michael Carnucci, being duly sworn, deposes and says that he is a Special Agent with the

Drug Enforcement Administration (DEA), duly appointed according to law and acting as such.

### Introduction

I am a Special Agent ("SA") with the Drug Enforcement Administration ("DEA"), duly

appointed according to law and acting as such. I have been employed by the Drug Enforcement

Administration as a Special Agent since March 2016.   As a Special Agent, I am responsible for,

among other things, conducting investigations of alleged criminal violations of the United States

statutes relating to drug and currency smuggling in violation of Title 21, United States Code,

Sections 841 and 846 and Title 18, United States Code, Sections 1956 and 1957.   Prior to my

employment with the DEA, I was a police officer with the National Security Agency for 4 years.

I am currently assigned to the St. Louis Division Office, Task Force Group 31.   Since becoming

a Special Agent with the DEA, I have been involved in several investigations involving drug-

trafficking organizations. Based on my training, experience, and participation in controlled

substance investigations, your affiant is familiar with the methods of operation of drug traffickers. During my tenure in law enforcement, I have participated in several drug investigations which have resulted in the seizure of heroin and methamphetamine. I am familiar with and have used normal methods of investigation, including, but not limited to, visual surveillance, questioning of witnesses, the use of search and arrest warrants, the use of informants, the utilization of undercover agents and the use of court-authorized wire intercepts.

The facts alleged in this affidavit come from my own investigation, my training and experience, and information obtained from other investigators and witnesses. As this affidavit is submitted for the limited purpose of establishing probable cause to locate and monitor the location of a cellular telephone as part of a criminal investigation, it does not set forth all of my knowledge regarding this matter.

Upon information and belief, and as explained in greater detail below, the AT&T cellular telephone bearing number **(314) 249-2499** (hereinafter "**subject cellular telephone #2**") has been used, and is presently being used, in connection with the commission of offenses involving ongoing violations of Title 21, United States Code, Sections 846 and 841(a)(1) (hereinafter referred to as "the subject offenses"), by Christopher BRYANT.

The present affidavit is being submitted in connection with an application of the Government for a warrant and order authorizing agents/officers of the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, to obtain location information, including precision location information, cell site location information, and other signaling information, including pen register information, in an effort to locate and monitor the location of **subject cellular telephone #2.**

2

Your affiant further states that there is probable cause to believe that the location information associated with **subject cellular telephone #2** will lead to evidence of the aforementioned subject offenses as well as to the identification of individuals who are engaged in the commission of those criminal offense and related crimes.

<u>**Investigation and Probable Cause**</u>

In March 2016, DEA St. Louis initiated an investigation into the Andre CURRY Drug Trafficking Organization ("DTO") after obtaining information from a Confidential Source (hereinafter referred as the "CS") regarding the heroin distribution activities of Jermaine HILL, Andre CURRY, Lester BULL, **Kelvis SMITH,** and numerous other co-conspirators. During the month of March 2016, investigators with DEA St. Louis debriefed a confidential source (hereafter, the "CS"[2]) who provided information related to **SMITH**'s operation. The CS's information has been shown to be reliable in this investigation, and other investigations have corroborated facts provided by the CS. The CS has cooperated with law enforcement and has participated in consensual phone call recordings with **SMITH** and other co-conspirators.

DEA group 31 debriefed the CS in reference to the transportation of narcotics by **SMITH,** who utilizes cellular telephone bearing number **(224) 588-6369** (hereinafter **subject cellular telephone #1**), subscribed to Platinum Charter Lines Inc., P.O. Box 384, North Chicago, IL

---

[2] Information from the CS has been shown to be reliable in that this investigation and other investigations have corroborated facts provided by the CS. The CS has performed multiple controlled purchases of heroin at the direction of DEA investigators. Information provided by the CS to the investigators has led to seizures of heroin and firearms. DEA has no information that indicates the CS is providing false information in any manner.

3

60064.[3]   The CS stated **SMITH** resides in Chicago, Illinois and travels to St. Louis, Missouri, Ohio, and California where **SMITH** picks up drug proceeds and narcotics.   The CS further stated that **SMITH** is a driver for a hip hop artist, "Q.L." The CS stated that **SMITH** has three large buses, two of which are for the transportation of Q.L. and a third which has a "trap" in the rear cargo area for storing drug proceeds (money) and narcotics.   Additionally, the CS stated that when **SMITH** arrives in St. Louis, Missouri, **SMITH** stays at the Westin Hotel in the downtown St. Louis area.   The CS further stated that **SMITH** communicates with two other individuals in the St. Louis, Missouri area, who the CS identified as "Black" and "Nitty".

### Authorization of Precision Location Warrant on March 21, 2016

On March 21, 2016, the Honorable Judge Noelle C. Collins authorized the use of a precision location warrant (PLW) and PEN Register for **subject cellular telephone #1**.   This telephone number is still currently being utilized by **SMITH**, who is believed to be a courier of narcotics and narcotic's proceeds, i.e., bulk U.S. currency.

### SMITH and BRYANT meet at Hollywood Casino on March 24, 2016

On March 24, 2016, investigators with DEA were contacted by the CS, who told them that **SMITH** would be traveling to the St. Louis, Missouri area and would be arriving at approximately seven or eight o'clock on March 24, 2016.   The CS further stated that **SMITH** would contact him/her upon **SMITH's** arrival in St. Louis.

---

[3] This cellular telephone number was previously an AT&T cellular-brand telephone subscribed to PLATINUM CHARTER LINES, INC., P.O. Box 384, North Chicago, IL 60064.

On March 24, 2016, at approximately 7:30p.m., the CS received a telephone call from **SMITH** advising that he was in St. Louis and giving the CS directions on where to meet. The CS met with **SMITH** at approximately 7:45 p.m. in the area of Olive and Delmar in St. Louis. During this meeting, which was recorded, **SMITH** told the CS that he was in town to meet with "his man down here", believed to be **Christopher BRYANT**. **SMITH** said "his man" was going to Arizona before **SMITH** met him. **SMITH** further stated "his man" (believed to be **BRYANT**) "took a loss". **SMITH** stated, "The money got caught up" when **BRYANT** was going to Arizona.[4] **SMITH** advised the CS that he would be driving to Los Angeles and that **BRYANT** would fly out there to meet **SMITH** to oversee the operation. Investigators believe that **SMITH** would then transport the narcotics back to St. Louis and **BRYANT** would fly back to St. Louis to meet him. **SMITH** further stated "his man here" (**BRYANT**), "can do thirty a month". Investigators believe this to be thirty kilograms, but **SMITH** did not specify cocaine or heroin.

Following the meeting between the CS and **SMITH**, surveillance followed **SMITH** to the area of the Hollywood Casino, located at 777 Casino Center Dr., Maryland Heights, MO 63043. **SMITH** parked his vehicle at the south end of the parking lot. At approximately 10:00 p.m., a 2008 GMC Yukon, bearing Missouri registration 39B-0AF (registered to **BRYANT**), with an address of 4433 Clarence, St. Charles[5], MO, pulled up next to **SMITH's** vehicle. Surveillance

---

[4] Investigators believe "the money got caught up" is referring to the seizure of approximately $463,365 from **BRYANT** in July of 2015 by another DEA office. Due to this seizure, investigators believe **BRYANT** obtained a new source of supply located in Los Angeles.

[5] It should be noted that during the meeting between the CS and **SMITH**, **SMITH** told the CS that the man he was meeting, believed to be **BRYANT**, resides in St. Charles.

was unable to maintain visual of the vehicle due to the openness of the parking lot, as investigators did not want to reveal their location.   At approximately 10:13 p.m., the black GMC Yukon left the lot.   At approximately 10:44 p.m. **SMITH's** vehicle left the parking lot.   Surveillance followed **SMITH** eastbound on I-70, to southbound I-270, and eventually terminated surveillance at I-55 southbound at Meramec Bottom Road.

During and following this meeting between the CS and **SMITH**, PEN register information for **subject cellular telephone #1** showed it to be in contact with cellular telephone bearing number **(314) 249-2499** (hereinafter **subject cellular telephone #2**)[6] three times and was the only other St. Louis-based telephone number besides the CS's cellular telephone number.   A check of the subscriber information for **subject cellular telephone #2** at that time showed the subscriber as being **BRYANT**.

Based on surveillance conducted and information obtained from the CS, investigators believe **SMITH** and **BRYANT** met at Hollywood Casino so that **BRYANT** could provide **SMITH** with a large amount of currency that was transported to Los Angeles, so that the unknown California Source of Supply ("SOS") could exchange it for Heroin.

Investigators later obtained information from the CS, and from a recorded meeting between the CS and **SMITH** on August 25, 2016, that during a March/April 2016 trip to Los Angeles, California, **SMITH** was transporting currency. An informant notified police about the currency, which led to a money seizure and a state-prosecuted money laundering case in California. **SMITH**

---

[6] It should be noted that this cellular telephone number was previously a T-Mobile cellular-brand telephone subscribed to **CHRISTOPHER BRYANT**, 4173 N EUCLID AVE., ST. LOUIS, MO 63115.   It changed to an AT&T cellular-brand telephone on September 13, 2016.

informed the CS that police also raided a house in the Los Angeles metropolitan area and seized money, based on an informant who was in Mexico. **SMITH** informed the CS that no narcotics would be sent from California until the criminal case is resolved. **SMITH** told the CS he was frustrated because he is owed money for transporting the currency.

### Meeting between Kelvis SMITH and Sean SUNDAY on August 25, 2016

On August 24, 2016, at approximately 7:40 p.m., the CS, during call session #656, made an outgoing call to **SMITH**, in which **SMITH** stated, "Hey "B", let me hit you right after I finish eating. I'm coming down there tomorrow."

On this same date, during call session #656, intercepted at approximately 8:27 p.m., the CS received an incoming call from **SMITH**, utilizing **subject cellular telephone #1**. During the intercepted call, **SMITH** told the CS, "Yeah, yeah, so... Yeah, I was going to take the train down there early in the morning, so I should probably get there around noon or something like that." **SMITH** informed the CS that he would arrange for transportation to a restaurant and they could meet there. **SMITH** requested that the CS call him when he was available.

On August 25, 2016, during call session #661, intercepted at approximately 11:47 p.m., the CS received an incoming text from **SMITH** using **subject cellular telephone #1**. The intercepted text from **SMITH** stated, "I will be there in an hour." The CS responded during call session #662 stating, "K..hit me whn ur here n let me known where." During call session #663, **SMITH** acknowledged the CS stating, "OK".

At approximately 12:00 p.m., DEA investigators responded to the Gateway Multimodal Transportation Center located at 430 S. 15th St., St. Louis, MO 63103. The Gateway Multimodal

7

Transportation Center is a rail and bus terminal station which serves Amtrak trains and Greyhound cross-country buses.

At approximately 12:37 p.m., GS Markhart observed a black male who matched the physical description of Kelvis **SMITH**, wearing a long-sleeve, button-down brown shirt and blue jeans, carrying a brown brief case, walking from the platform of the Amtrak Train.

At approximately 12:42 p.m., Markhart observed **SMITH** walk out of the eastside terminal toward the Metro-link station located on 14th Street. Several minutes later, SA Dave Wilmsmeyer located **SMITH** walking east across 14th Street toward the City Center Hotel, located at 400 S. 14th St, St. Louis, MO 63103.

At approximately 12:45 p.m., TFO Patrick Welch observed **SMITH** siting in the lobby inside the City Center Hotel looking at his cell phone.

At approximately 12:50 p.m., TFO Patrick Welch observed **SMITH** walking toward the Budget Rental Car Company, located inside the Hotel.

During call session #661, intercepted at approximately 12:53 p.m., the CS received an incoming text from **SMITH** using **subject cellular telephone #1**. The intercepted text from **SMITH** stated, "Meet me at Sweetie Pies restaurant by Fox Theater where we were last time."

At approximately 12:55 p.m., SA Wilmsmeyer and TFO Christopher Moss observed **SMITH** walk outside to the parking lot located directly behind the City Center Hotel with an unknown individual (who was believed to be a Budget Rental Car Company employee). **SMITH** and the unknown male walked around a black Ford Taurus bearing Missouri License plate FN8A4C, appearing to inspect the vehicle. **SMITH** eventually got inside the vehicle.

8

At approximately 1:18 p.m., SA Wilmsmeyer and TFO Christopher Moss observed **SMITH** depart the parking lot, driving the aforementioned Ford Taurus. Surveillance was maintained. Telephone toll analysis of **subject cellular telephone #1** showed that approximately four minutes earlier, at 1:14 p.m., **subject cellular telephone #1 (SMITH)** made an outgoing call to (618) 802-2308 (hereafter referred to as **subject cellular telephone #3**[7], a telephone believed to be utilized by **Shawn SUNDAY)**, which lasted approximately one minute and eleven seconds.

At approximately 1:21 p.m., SA Blake Witzman and TFO Michael Schroeder met with the CS at a predetermined meet location prior to the CS's meeting with **SMITH,** and equipped the CS with a KEL and video/audio recording device(s). At approximately 1:29 p.m., the CS left the predetermined meet location, followed by SA Blake Witzman and TFO Michael Schroeder.

At approximately 1:35 p.m., the surveillance team observed **SMITH** park the black Ford Taurus in the 4900 block of Tholozan on the north side of the street.

During call session # 677, intercepted at approximately 1:38 p.m., the CS received an incoming text from **subject cellular telephone #1**. The intercepted text from **SMITH** stated, "I went up the street to another meeting. I will be done in about half hour." During call session #678, the CS responded, "Sht..almost there..ok..willwaitaround."

At approximately 1:40 p.m., the CS arrived at Sweetie Pies, located at 3643 Delmar Ave., St. Louis, MO 63108. During call session #679, intercepted at approximately 1:43 p.m., the CS

---

[7] Investigators utilized the LexisNexis "Real Time Phone Search" feature to identify Sean SUNDAY as a possible user for telephone number (618) 802-2308. LexisNexis/Accurint for Law Enforcement is a law enforcement database that obtains information derived from public records and commercially available data sources. Investigators were able to independently corroborate LexisNexis information by conducting an inquiry with Ameren UE, which revealed that Sean SUNDAY has active utility service at 4948 Tholozan Ave. 1st Floor, St. Louis, Missouri 63109, and provided Ameren with contact telephone number (618) 802-2308.

9

sent a text message to **subject cellular telephone #1** stating, "Am parked infront of sweetie pies..u know my ride..to lazy to move again..will be right here parked." **SMITH** responded during call session #680 stating, "OK".

At approximately 1:41 p.m., GS Arnold Baratti observed a black male wearing a white t-shirt, with dreadlocked hair, walk from one of the residences between 4948 and 4956 Tholozan. The unidentified black male walked to a black Hyundai bearing Illinois License E458791, parked behind the aforementioned black Ford Taurus occupied by **SMITH**. GS Baratti observed the unidentified male move the black Hyundai and park on the south side of the street.

At approximately 1:42 p.m., GS Baratti observed the unidentified male exit the black Hyundai as **SMITH** got out of the black Ford Taurus. Both **SMITH** and the unidentified male walked together toward one of the residences between 4948 and 4956 Tholozan.

Illinois License number E458791 is registered to a silver four-door Chevrolet, that is registered to **Shawn SUNDAY**, 7301 Church Lane, Centreville, Illinois 62207. An inquiry of Law Enforcement databases revealed **Shawn SUNDAY** is on federal supervised release for Conspiracy to Distribute Cocaine, and provided his address as 4948 Tholozan to his probation officer.

During call session #681, intercepted at approximately 2:27 p.m., the CS received an incoming text from **subject cellular telephone #1**. The intercepted text from **SMITH** stated, "Heading that way in 10 min." The CS responded during call session #682 stating, " K kool."

At approximately 2:53 p.m., **SMITH** was observed by GS Baratti walking back to his vehicle. **SMITH** got into his vehicle and departed the area.

At approximately 3:15 p.m., investigators observed **SMITH** arrive at Sweetie Pies, located at 3643 Delmar Ave., St. Louis, MO 63108. **SMITH** parked the black Ford Taurus in front of the

location, exited the vehicle and walked toward the CS's vehicle, opened the passenger door and got inside.

The CS and **SMITH** spoke for approximately 15 minutes. The CS later told agents that the following was discussed during that time: **SMITH** informed the CS that during a trip to California, in which **SMITH** transported currency, an informant tipped police off to the currency, which led to the money being seized and state charges being brought for money laundering. **SMITH** also informed the CS that the informant who provided the tip currently (then) lives in Mexico. **SMITH** informed the CS that no narcotics would be sent from California until the state case was resolved. **SMITH** also told the CS he was frustrated because he was owed money for transporting the currency. At the conclusion of the conversation, **SMITH** got out of the CS's vehicle and went inside of Sweetie Pies. The CS was then followed back to the predetermined meet location where the KEL and recording device were seized by TFO Michael Schroeder, as witnessed by SA Blake Witzman.   At approximately 3:40 p.m., surveillance was terminated.

It is your affiant's belief that **SMITH** came to Saint Louis, MO to meet with **SUNDAY** to discuss his frustrations with the drug trafficking organization operated by **BRYANT** and **SUNDAY,** and the fact that **SMITH** was not getting paid for transporting currency to California while operations were shut down.   Furthermore, **SMITH** told the CS about this same money being seized by Law Enforcement in California due to a tip from a confidential informant.   Additionally, through toll analysis, investigators believe **SMITH** and **SUNDAY** communicate over **subject cellular telephones #1 and #3** prior to their face-to-face meetings.

11

## Consensually Recorded Calls Between the CS and SMITH

On November 4, 2016, at approximately 11:42 a.m., (ref call session 797) the CS placed an outgoing recorded phone call to **SMITH**, who was utilizing **subject cellular telephone #1**. During the call the CS and **SMITH** were engaged in general conversation. The following is a transcription of the conclusion of the conversation:

CS:       If you uh, if I don't see you now ima try and see you around Thanksgiving, I got a, I got a small proposition we can work on like a little job, just stop by if you got time. Just stop by, you know?

SMITH:   Yeah, I might, I might come through next week sometime. I'll have that other thing up and running cuz I couldn't get over there yesterday so I'm trying to go over there today and get something new and I'll call you on the other thing.

CS:       And talk to your cousin and wanna book on that bigger proposition and see how that works, you know.

SMITH:   Right, right ok.

CS:       And go from there **SMITH:** I told you, I know the dude, everything on that so you know.

CS:       Alright.

SMITH:   I'll give you a holler after I get my other thing.

The CS informed SA Blake Witzman that the intercepted conversation with **SMITH** referred to the CS finding a SOS in California for heroin and, in return, **SMITH** would be responsible for finding a buyer/money source in St. Louis. The CS informed SA Witzman that when he/she stated, "talk to your cousin" to **SMITH,** the CS was referring to the buyer/money

12

source, who is believed to be **BRYANT.** The CS informed SA Witzman that **SMITH** would come to St. Louis to speak to the CS about specifics related to a possible narcotics transaction. The CS informed SA Witzman that he/she believed **SMITH** would also meet with the buyer/money source while in St. Louis.

On November 15, 2016, at approximately 11:55 a.m., (ref call session 838) the CS received an incoming recorded phone call from **SMITH**, who was utilizing **subject cellular telephone #1.** The following is a transcription of the conversation:

CS:      Yo

**SMITH:**      What up B?

CS:      Shit, trying to pick up my people.

**SMITH:**      I'm about 20 miles away from there, Ima be there in about 30 minutes and Ima run to a meeting real quick so you gonna be free?

CS:      Yeah, after like 4, I gotta do something at 2:30, I gotta pick somebody from work I already promised them as soon as I'm done at 3:30 I'm free. But you said how long you gonna be at the meeting?

**SMITH:**      Just, just about 30 minutes cuz I need to see you before then cuz I'm just in and out of here cuz I gotta fly to LA tomorrow.

CS:      Call me, I'll come see you.

**SMITH:**      I'll be in the downtown area.

CS:      Alright I'll come see you.

**SMITH:**      Alright, later.

13

The CS contacted SA Witzman and explained the intercepted phone call. The CS informed SA Witzman that **SMITH** was close to St. Louis and wanted to meet with him/her. The CS informed SA Witzman that he/she believed they would discuss a potential narcotics transaction. The CS indicated that **SMITH** was going to meet with another subject while in St. Louis, who the CS believed was the buyer/money source. Investigators later positively identified this individual as **BRYANT**, as explained in the paragraph below.

### Recorded Meeting of the CS and SMITH

On November 15, 2016, SA Witzman and Task Force Officer (TFO) Brian Seppi met with the CS at an undisclosed location prior to a meeting between **SMITH** and the CS. SA Witzman equipped the CS with a live audio monitoring device and video/audio recording device(s). The CS then left the undisclosed location and headed toward Sweetie Pies restaurant located at 3643 Delmar Avenue, St. Louis, MO 63108. (investigators had previously monitored a meeting between the CS and **SMITH** at this location on August 25, 2016.)

Upon the CS's arrival, he/she was met by **SMITH.** Members of DEA group 31 conducted surveillance of the meeting between the CS and **SMITH.** The CS exited his/her vehicle and met with **SMITH,** who was standing outside in front of the restaurant. During the meeting **SMITH** informed the CS he was supposed to fly to Los Angeles early that morning, however, he was contacted by an individual (who investigators later determined was **BRYANT). SMITH** told the CS he was going to meet that individual after his meeting with the CS. **SMITH** informed the CS he delayed his trip to Los Angeles and would not leave until Wednesday or Thursday. During the meeting with the CS, **SMITH** took a call from an unknown individual to whom **SMITH** stated, "You in there? Ok. I'll be around there in a minute." It should be noted that around that same

14

period of time, **SMITH** received an incoming phone call from **subject cellular telephone #2**, which lasted approximately 36 seconds.

After the phone call, **SMITH** informed the CS he was going to meet someone at "Best Steak House". **SMITH** asked the CS if he/she had "something going". The CS informed **SMITH** if he had "a market right here", he could arrange for heroin to be brought to St. Louis. The CS informed **SMITH** he knew a California SOS and could get it at a good price. The CS told **SMITH** he knew a SOS that was charging $65,000 per kilogram of heroin. The CS informed **SMITH** he could make $5,000 per kilogram, if he gave it to his buyer/money source for $70,000 per kilogram. **SMITH** informed the CS that "They already doing that. They already getting that price." **SMITH** informed the CS that he thought "they" were obtaining kilograms of heroin for $65,000 per kilogram. **SMITH** then informed the CS he was going to meet with one of the subjects (later identified as **BRYANT**), after his meeting with the CS to discuss what investigators believe was a debt owed to **SMITH** by **BRYANT,** as well as other drug trafficking opportunities. **SMITH** informed the CS he preferred to pick the narcotics up himself as opposed to having another courier involved. The CS and **SMITH** continued to discuss kilogram prices of heroin. **SMITH** expressed frustration to the CS, indicating his money was "tied up" and he was going around the corner "to see what he got now." SA Witzman believes **SMITH** is referring to money owed to him by **BRYANT.**

Based on information from the CS, and intercepted conversations between **SMITH** and the CS over the course of the last five months, investigators believe **BRYANT** owes **SMITH** money for transporting his currency hidden in a compartment inside one of his Charter Buses, from St. Louis to Los Angeles California, in late March/early April of 2016. **SMITH** informed the CS on

15

several occasions that during the trip to California, local law enforcement seized the currency once it went into a house in the Los Angeles area, before any narcotics were received. **SMITH** has told the-CS that he is owed money and the trip was a major setback. However, investigators have not been able to confirm the seizure of currency due to the lack of specific information related to the incident. **SMITH** informed the CS during the meeting that the other parties involved are still going to court over the seizure. The CS and **SMITH** continued to discuss specifics related to a narcotics transaction and agreed that they should only do five (5) kilograms of heroin at a time. **SMITH** informed the CS that he believed that was all "they" would be able to do. **SMITH** informed the CS that he had to leave and the CS asked **SMITH** to talk to "them" and let he/she know what they say. Both parties departed the location.

### The Target Subjects Meet at The Best Steak House

Group 31 members maintained surveillance on **SMITH** as he walked to a red Ford Fusion bearing Illinois license plate V917450. **SMITH** got into the driver side of the vehicle and began traveling east on Delmar. Group 31 members maintained surveillance of **SMITH** to The Best Steak House, located at 516 N. Grand Blvd, St. Louis, MO 63103. At approximately 1:46 p.m., **SMITH** parked the aforementioned vehicle and went inside. Your affiant went inside the restaurant where he observed **SMITH** meeting with an unknown black male subject wearing a grey sweat shirt. At approximately 2:25 p.m. the unknown black male subject meeting with **SMITH** was observed walking out of the restaurant by TFO Jason Staats. SA Witzman later provided TFO Staats with a photograph of **BRYANT** and TFO Staats positively identified the aforementioned subject as **BRYANT.** TFO Staats then observed **SMITH** walk outside of the restaurant and walk to a white Toyota Avalon bearing Missouri License Plate PP5-B9E, registered to **BRYANT** and Company

16

LLC, 2025 Zumwalt Rd. Suit, St. Charles Missouri 63033, with **BRYANT**. **SMITH** and **BRYANT** got into the vehicle and drove to **SMITH's** vehicle which was parked nearby. **SMITH** exited the Toyota Avalon and returned to his vehicle. Surveillance then observed **SMITH** and **BRYANT** leave in tandem in their vehicles. Group 31 members continued surveillance following **SMITH** and **BRYANT** to 12022 Larimore Rd., Spanish Lake, Missouri 63138. Both vehicles pulled in the driveway, however, Group 31 members were unable to observe either subject go inside. However, immediately after, both cars were observed unoccupied. After approximately ten minutes, SA Witzman observed **SMITH** headed east on Larimore at the same time TFO Seppi observed **BRYANT** driving west on Larimore. TFO Seppi indicated that **BRYANT** looked at his vehicle and appeared to be observant of his surroundings. Surveillance was terminated after **SMITH** and **BRYANT** left the residence.

Based on information from the CS and recorded conversation between the CS and **SMITH,** investigators believe **SMITH** followed **BRYANT** to 12022 Larimore Rd., in order to pick up money owed to **SMITH** by **BRYANT.** Investigators believe **BRYANT** owes money to **SMITH** for transporting his currency hidden in a compartment inside of his charter bus, from St. Louis to Los Angeles California, in late March/early April of 2016.

On November 16, 2016, at approximately 11:32 a.m., (ref call session 838) the CS received an incoming recorded phone call from **SMITH**, who was utilizing **subject cellular telephone #1.** The following is a transcription of the conclusion of the conversation:

CS:        Yes sir

**SMITH:**        What's up B?

CS:        Shit, I was waiting for you to hit me back.

17

| SMITH: | Yeah, shit I got on the road, I was talking to my girl, man I forgot to call you back, I left there about 7. |
|---|---|
| CS: | What I have to do yesterday is pick up the same people that I wall telling you that could make that decision with, but you said I had told you the price and everything. |
| SMITH: | Yeah, yeah. |
| CS: | That's who I went to pick up yesterday. |
| SMITH: | I got you cuz they said it's all good. |
| CS: | Alright, alright well one day when you have some time we need to just sit and talk and jump on that. |
| SMITH: | Yeah, I'm coming back after Thanksgiving. |
| CS: | Alright, after Thanksgiving? |
| SMITH: | Yeah I'll be back down. |
| CS: | Alright, me and my dude right now, we just kicking it, it's his first time here so we driving around, when I talked to him about that yesterday right and today, and he said 4 or five possibility you known that's a sure thing. |
| SMITH: | Oh ok. |
| CS: | So tell them that price range if they wanna do it we good on that. |
| SMITH: | Yeah yeah, ok, I'm gonna hit you up right after Thanksgiving, did you decide if you were going to LA? |

The call ended with general conversation. After, the CS informed SA Blake Witzman that the CS met with an individual he/she knew as "Dave", who was in town from Los Angeles,

18

California. The CS said that "Dave" was Belizean and was connected to a large heroin SOS operating in the Los Angeles area. The CS informed SA Witzman that he/she discussed brokering a deal with "Dave" for 4 to 5 kilograms of heroin at $65,000 per kilogram between the SOS in California, **SMITH** and **SMITH's** money source/buyer, who investigators believe will be **BRYANT**. The CS informed SA Witzman that the intercepted incoming call from **SMITH,** utilizing **subject cellular telephone #1,** was to discuss and confirm interest in the deal for four to five kilograms of heroin.

### Authorization of Precision Location Warrant on November 22, 2016

On November 22, 2016, the Honorable Judge John M. Bodenhausen, Eastern District of Missouri, signed a Precision Location Warrant for **subject cellular telephone #2,** 314-249-2499, an AT&T cellular device believed to be utilized by **Christopher BRYANT,** and **subject cellular telephone #1,** 224-588-6369, a Verizon cellular device believed to be utilized by **Kelvis SMITH**.

### Meeting between the Target Subjects at Hollywood Casino on December 7, 2016

On December 7, 2016, at approximately 4:15 a.m., precision location information associated with **subject cellular telephone #1** placed this device on Interstate 55 in Illinois traveling south toward St. Louis. Additionally, **subject cellular telephone #2,** at approximately 4:56 a.m. was located in the area of Larimore Road and Congress Avenue, Saint Louis, MO. It should be noted that **BRYANT** has a residence located at 12033 Larimore Road, Saint Louis, MO which is within the radius of the ping location associated to the **subject cellular telephone #2.**

At approximately 6:12 a.m., DEA Task Force Group 31 members located the black motor coach bearing Florida license plate "205YHQ", registered to Entertainment Coaches of America LLC. Investigators followed the motor coach to the area of the Hollywood Casino, 777 Casino

19

Center Dr., Maryland Heights, MO 63043. This was a previous destination of **KELVIS SMITH** during March 24, 2016, where **SMITH** and **BRYANT** met.

After the motor coach arrived at Hollywood Casino investigators began monitoring precision location information associated with **BRYANT**'s telephone, **subject cellular telephone #2**. At approximately 8:03 a.m., precision location information associated with **subject cellular telephone #2** showed the device had moved from the area of Larimore Road.

At approximately 9:03 a.m., precision location information associated with **subject cellular telephone #2** showed the device in the area of Jungermann Road and Barkwood Trail Drive, Saint Charles, MO.    Based on prior DEA investigations, investigators responded to the area of 1939 Cutright Lane, Saint Charles, MO, an address associated to **BRYANT**.    Upon arrival, SA Sean Kassouf and TFO Jason Staats established surveillance of 1939 Cutright Lane, Saint Charles, MO.    While at the residence, Investigators observed a black Cadillac Escalade with tinted windows near the residence, while precision location information associated with **subject cellular telephone #2** continued to place the device in the area.

At approximately 9:20 a.m., the vehicle departed the area.    Investigators believed the vehicle to be doing "heat runs" or counter surveillance due to its driving behavior. The vehicle then departed the area.    Once precision location information associated with **subject cellular telephone #2** showed the device departed the area, SA Kassouf and TFO Staats left the area.

At approximately 9:29 a.m., TFO Jonathan Woodard observed a newer model black Escalade pull into the truck parking lot of the Hollywood Casino. The black Escalade pulled up next to the aforementioned motor coach on its passenger side. Investigators observed a heavy set black male who fit the physical description of **BRYANT**, exit the passenger side front seat of the

20

vehicle. The subject believed to be **BRYANT** walked over to the passenger side of the motor coach and knocked on the door. The subject then returned to the rear of the Escalade and opened the trunk of the vehicle. The subject removed a tan jacket and placed it over his head then removed a red suitcase and black duffle bag. The subject believed to be **BRYANT** returned to the motor coach as the door opened and went inside the motor coach with the luggage. The subject, who investigators believed was **BRYANT,** returned to the driver side of the Escalade and appeared to be talking to the driver. The subject then entered the motor coach as the Escalade departed the area. Surveillance team members followed the Escalade out of the area and were able to obtain the license plate. The Escalade bearing Missouri License plate: 12B 2BJ, was registered to Sharonda **BRYANT**, 2025 Zumbehl Rd., Saint Charles, MO 63303. It should be noted that precision location information associated with **subject cellular telephones #1 and #2** placed the devices in the area of Hollywood Casino around the time the Escalade arrived and after the Escalade departed the area, leading investigators to believe **BRYANT** to still be on the bus with **SMITH**.

At approximately 11:50 a.m., the bus departed the parking lot and traveled westbound on Interstate 70. Surveillance was terminated in the area of Wright City, MO.

Both **subject cellular telephones #1** and **#2** were tracked, via precision location information, to the Los Angeles, California area where they remained until December 10, 2016.

On December 10, 2016, precision location information associated to **subject cellular telephone #2** showed this device traveling east out of the Los Angeles, CA area while **subject cellular telephone #1** remained in the California region. Investigators thought this to be odd as both cellular telephones traveled to California together and investigators believed both **subject cellular telephones #1 and #2** would return to the St. Louis, MO area together.

21

### Traffic stop of BRYANT on December 12, 2016

On December 12, 2016, at approximately 1:56 p.m., precision location information associated with **subject cellular telephone #2** placed the device in the area of Salina, Kansas. Investigators moved into position to establish surveillance of Interstate 70 to attempt identification of the vehicle **BRYANT** could possibly be in and to attempt an interdiction stop of said vehicle.

At approximately 6:30 p.m., TFO Christopher Moss observed the above-described motor coach bus traveling eastbound on Interstate 70. Surveillance was maintained on the bus and the precision location information associated to **subject cellular telephone #2** appeared to be traveling in unison with the bus.

At approximately 8:01 p.m., Police Officer ("PO") Casey Boaz, DSN 524, St. Charles County Police Department observed the bus exceed the posted speed limit and follow too closely to another motor vehicle. As a result, PO Boaz conducted a traffic stop of the bus. The driver was identified as Maurio ATES and the passenger was **BRYANT**. PO Boaz asked ATES if he was the owner of the bus, to which ATES told PO Boaz that he was being paid to drive the sole passenger and was not the owner of the bus. PO Boaz asked ATES to exit the bus and have a seat in his patrol car while he conducted computer records checks associated with the status of his driving record. While PO Boaz conducted records checks of ATES, PO Boaz engaged ATES in casual conversation. ATES stated he drove his personal car from Wisconsin to Illinois and picked up the bus from the company. ATES drove the bus to St. Louis, Missouri to pick up "Christopher", referring to BRYANT. ATES stated BRYANT was a music producer and bought houses. ATES said he was being paid to drive BRYANT to Los Angeles, California where he would begin a tour for his music production. ATES said they spent two nights in LA at a music performance and then

22

drove to Lyman, Colorado. They spent two nights in Lyman for another music performance. Then they were headed to St. Louis to drop BRYANT off and then ATES would head home. PO Boaz asked ATES if anyone was partying on the bus during the performances and if anyone had been using drugs on the bus. ATES said that he did not have knowledge of anything like that. PO Boaz asked ATES if he minded if PO Thomas deployed his canine on the bus, and ATES said that it was "ok". PO Boaz requested PO Thomas deploy his canine Tyson and conduct a free air sniff of the bus.

During the canine deployment, PO Thomas spoke with **BRYANT,** and **BRYANT** stated he spent three days in Los Angeles to look at real estate - **BRYANT** made no mention of Colorado or music performances. That statement was in conflict with what ATES had said about the trip. PO Thomas completed his canine deployment and advised that he had received an affirmative response for narcotics within the vehicle from Tyson.[8]

After, the bus was re-located to Superior Towing, located at 11 Elaine Drive, Saint Charles, MO, to conduct a more thorough search of the interior as searching a bus on the side of the interstate posed a risk to Officers and occupants alike. Both ATES and **BRYANT** were escorted to Superior Towing by Officers.

Upon arrival at Superior Towing, PO Thomas deployed his canine inside of the bus. PO Thomas advised PO Boaz to focus the search in the rear sitting area nearest the back wall, as this was the location the K9 was alerting to. While continuing the search, PO Boaz located a gap along the construction of the rear wall and side wall. PO Boaz noted that there appeared to be about

---

[8] It should be noted that your affiant and other investigators have worked with Tyson and Officer Thomas extensively in the past and have found Tyson to be reliable in the detection of drug odor.

two feet of unused space behind that rear wall. PO Boaz looked at the exterior of the bus and noted

that the rear window had about 30 inches of distance between the edge of the window and the back

edge of the bus on the exterior. Inside the bus, there was only about six inches between the back

edge of the window and the rear interior wall. Through PO Boaz's training and experience, PO

Boaz recognized these as indications that there was a possible "trap"/aftermarket false

wall/compartment in the rear wall.   PO Boaz, utilizing a video scope[9], was able to see into the

"trap" and located aftermarket brackets, wood construction, and foil lining.

   PO Boaz was able to open the false wall, which revealed a very large aftermarket

compartment. A black trash bag was lying on the bottom of that compartment. PO Boaz opened

the trash bag and discovered four (4) vacuum packaged bricks of a compressed substance. Through

training and experience, PO Boaz believed the packages contained cocaine. Each package was

estimated to weigh about two pounds.   A field test of the narcotics was conducted and a positive

indication for cocaine was given.

   Both ATES and **BRYANT** were read their rights per Miranda and completed a waiver of

rights form.   They were subsequently turned over to Detectives with the St. Charles County

Regional Drug Task Force for processing and questioning.

### Search Warrant in Los Angeles, California

   On December 20, 2016, TFO Michael Schroeder made contact with Detective Dan Gomez

with the Los Angeles California Sherriff's Department, LA IMPACT Group 2.   The following is

---

[9] A video scope is a device utilized by Law Enforcement to see into areas which are hidden, or
hard to see from the surface area.

a summation of a reported search warrant conducted on March 29, 2016 at 22433 South Vermont Avenue, #342, Torrance, CA 90202.

On March 29, 2016, LA IMPACT Group 2 conducted a search warrant of the above residence. Upon entering the residence, Officers located Salvado ANDRADE, Timothy TATUM, and **BRYANT** inside.

During a search of the residence, California Highway Patrol K9 Officer Orcutt located a red/black bag on the couch and two sealed bags of money on the kitchen counter (#1: $120,055.00, #2: $70,090.00). A K9 alerted to both locations and gave a positive indication for narcotics on both bags of money. Located within the southern bedroom closet was an AR-style .223 caliber "Star" magazine with various quantities of ammunition. Det. Coley located two AR-style rifles, an AR-style magazine, and a singe .223 caliber round in the closet on the balcony. All three subjects were subsequently arrested and interviewed. Each subject was advised of their rights per Miranda.

**BRYANT** told investigators that he was at the location to visit. **BRYANT** further advised that the person he was there to visit was not at the location and he was waiting for him. **BRYANT** claimed no knowledge of the money or the weapons. It should be noted that upon arrest of **BRYANT**, $2,960.00 in US Currency was located in the jacket he was wearing. **BRYANT** told investigators that he received the money from proceeds for real estate investments. This money was seized as part of the investigation.

TFO Michael Schroeder also received information from LA IMPACT Detective Dan Gomez that the above warrant was executed in relation to a "money rip"/reversal operation in which **BRYANT** was to bring money to a deal in return for narcotics.

25

It is your affiant's belief that, despite the money seized from **BRYANT** in March of 2016 and the seizure of narcotics in December 2016, **BRYANT** will continue to find new sources of supply and new ways to operate and transport narcotics, even with the recent seizures of money and narcotics. Furthermore, through toll record analysis, investigators know **subject cellular telephones #1 and #2** are still in communication and believe **BRYANT** and **SMITH** will continue to work together to purchase and transport narcotics.

### Authorization of Precision Location Warrant on January 5, 2017

On January 5, 2017, the Honorable Judge John M. Bodenhausen, Eastern District of Missouri, signed a Precision Location Warrant for **subject cellular telephone #1**, 224-588-6369, a Verizon cellular device believed to be utilized by **Kelvis SMITH** and **subject cellular telephone #2**, 314-249-2499, an AT&T cellular device believed to be utilized by **Christopher BRYANT.**

### Surveillance of Christopher BRYANT, Kelvis SMITH, and Shawn SUNDAY on January 26, 2017

On January 26, 2017, investigators conducted physical and electronic surveillance of **Kelvis SMITH, Christopher BRYANT**, and **Shawn SUNDAY**, in the St. Louis Metropolitan area. The surveillance was in conjunction with the federally authorized precision location warrant associated with the cellular telephones utilized by **SMITH (subject cellular telephone #1)** and **BRYANT (subject cellular telephone #2)**. Additionally, communication between the CS and **SMITH** were recorded through consensual interceptions over the CS's phone.

The day before, on January 25, 2017, at approximately 10:51 p.m., call session #1000, the CS received a telephone call from **SMITH**, utilizing **subject cellular telephone #1**. During this telephone conversation, **SMITH** told the CS that he was in Saint Louis and had a "meeting in the morning". **SMITH** and the CS had a general conversation as to wanting to get together to have

26

lunch and talk.   Furthermore, **SMITH** told the CS that he was going to leave the Saint Louis area around 4:30 or 5:00 p.m. following said meeting. Furthermore, the CS told **SMITH**, "I'll grab you, if you ain't riding I'll grab you."   **SMITH** replied, "Yeah, I got a rental car."   The conversation ended with **SMITH** telling the CS, "Yeah, okay, alright, well I'll hit you up in the morning then."

Notably, telephone toll analysis of **subject cellular telephone #1** showed that cellular device being in contact with **subject cellular telephone #2** and **subject cellular telephone #3**, a telephone believed to be utilized by **Shawn SUNDAY**, prior to and after the communications with the CS.   Investigators believe the "meeting" **SMITH** referred to in the above conversation is a meeting with **BRYANT** and **SUNDAY,** who investigators believe are criminal associates of **SMITH's.**

On January 26, 2017, investigators obtained rental car information relative to the current rental vehicle being operated by **Kelvis SMITH**; that vehicle was identified as a 2017 Jeep Patriot, bearing Missouri license AJ1Z8K.   Additionally, investigators obtained precision location information through the use of a federal-court authorized precision location warrant as to the whereabouts of **subject cellular telephone #1**.   Information obtained through the precision location information gave a location of 811 Spruce Street, Saint Louis, MO.   Investigators identified this location as being The Westin St. Louis Hotel, 811 Spruce Street, Saint Louis, MO.

At approximately 12:20 p.m., SA Carnucci arrived at The Westin St. Louis Hotel and observed the aforementioned Jeep Patriot parked in the visitor parking lot unoccupied. Surveillance was maintained on the vehicle at that time.

At approximately 1:00 p.m., SA Carnucci observed a black male, identified as **Kelvis SMITH** enter the driver seat of the Jeep.   The Jeep departed the parking lot and drove to the front

27

of The Westin St. Louis Hotel. A short time thereafter **SMITH** exited his vehicle, retrieved a

large suitcase and a duffle bag, placed both bags into his vehicle and departed the area.

Surveillance was maintained on **SMITH** as he traveled westbound on Interstate 70.

Prior to **SMITH's** departure from The Westin St. Louis Hotel, at approximately 12:47 p.m.

**SMITH** made an outgoing call, which lasted approximately 56 seconds, to **subject cellular**

**telephone #3**. Following this contact, **SMITH** completed an outgoing text message **subject**

**cellular telephone #2** at approximately 12:51 p.m.

At approximately 1:11 p.m., TFO Schroeder observed **SMITH** arrive at the LOVE'S

Travel Stop, located at 6124 North Broadway, Saint Louis, MO. SA Daniels observed **SMITH**,

the only occupant of the vehicle exit the vehicle at approximately 1:30 p.m. and walk inside the

LOVE'S Travel Stop. SA Daniels observed **SMITH** exit the LOVE'S Travel Stop at

approximately 1:33 p.m. and get back into the driver seat of his vehicle. At approximately 2:00

p.m., SA Daniels observed **SMITH** exit the vehicle again and walked into the LOVE'S Travel

Stop. At approximately 2:06 p.m., SA Daniels observed **SMITH** exit the LOVE'S Travel Stop

once more and got back into the driver's seat of his vehicle. At approximately 2:08 p.m. SA

Daniels observed **SMITH** depart the area.

Notably, at approximately 1:51 p.m., call session #1003, the CS sent a text message to

**SMITH** stating, "Waiting on u to go eat." **SMITH** replied at approximately 1:58 p.m., call

session #1004, stating, "still in meeting."

Due to traffic, surveillance units were unable to maintain visual surveillance of **SMITH** as

he travelled westbound on Interstate 70. However, through the use of a federally authorized

precision location warrant on both **subject cellular telephones #1 and #2**, investigators believed

both subjects to be in the area of Natural Bridge Avenue and Union Blvd., Saint Louis, MO. Additionally, at approximately 2:16 p.m., **subject cellular telephone #1** made an outgoing call, which lasted approximately 22 seconds, to **subject cellular telephone #3**.

Investigators believe **SMITH** contacted **SUNDAY** to ascertain a meet location. Investigators believe this because they observed **SMITH** and **SUNDAY** meeting a short time later in the area where **subject cellular telephone #1** was located.

At approximately 2:59 p.m., surveillance was re-established as TFO Seppi observed **SMITH's** vehicle pulled to the side of the road in the 3400 block of Belt Avenue, Saint Louis, MO. This area is within the range of the precision location information for both cellular telephones associated with **SMITH** and **BRYANT**. TFO Seppi observed **SMITH** seated in the driver's seat of his vehicle and a subject, who was believed to be **Shawn SUNDAY**, standing at the driver's door of **SMITH's** vehicle. TFO Seppi also observed a black Hyundai sedan bearing Illinois license plate "E458791" parked behind **SMITH's** vehicle. Investigators, through previous surveillances identified these license plates to return to a four-door 2002 Chevrolet, registered to **Shawn SUNDAY**. Furthermore, at approximately 2:59 p.m., **subject cellular telephone #1** sent a text message to **subject cellular telephone #2**.

At approximately 3:01 p.m., TFO Seppi observed **SMITH's** vehicle depart the area.

At approximately 3:09 p.m., **subject cellular telephone #1** made an outgoing call, which lasted approximately 33 seconds, to **subject cellular telephone #2**. Additionally, **subject cellular telephone #1** then made another outgoing call, which lasted approximately 23 seconds, to **subject cellular telephone #2**.

29

At approximately 3:20 p.m., SA Daniels observed **SMITH's** vehicle pull into the parking lot of the "Waffle House" located at 4525 James S McDonnell Blvd., Saint Louis, MO 63134. **SMITH** parked his vehicle directly in front of the restaurant and went inside. TFO Briggs observed a white panel van, with an orange ladder on top, bearing Missouri registration of "DL4K4K", registered to **Christopher BRYANT**, parked on the parking lot directly behind **SMITH's** vehicle. Furthermore, TFO Briggs observed a black male subject, believed to be **BRYANT**, seated in the driver's seat of the van. Additionally, at approximately 3:37 p.m., **subject cellular telephone #1** received an incoming call, which lasted approximately 23 seconds, from **subject cellular telephone #2**.

At approximately 3:46 p.m., TFO Schroeder observed **SMITH** exit the Waffle House and got into the passenger side of **BRYANT's** van. Shortly thereafter, TFO Schroeder observed **SMITH** and **BRYANT** exit the van and walked to **SMITH's** vehicle. **SMITH** removed the aforementioned suitcases from his vehicle and put them in the van. **SMITH** then walked back to his vehicle and got into the driver's seat as **BRYANT** got into the driver's seat of his vehicle.

At approximately 3:47 p.m., TFO Schroeder observed **SMITH** depart the parking lot of the Waffle House followed by **BRYANT's** vehicle.

At approximately 3:52 p.m., TFO Woodard observed **SMITH** arrive at Budget Car Rental, located at 10482 Natural Bridge Road, Saint Louis, MO. While **SMITH** returned his vehicle, **BRYANT** parked in the visitor parking lot adjacent to Budget Car Rental. Surveillance units were unable to maintain visual surveillance of **SMITH** as he returned his vehicle nor did investigators actually see **SMITH** enter into **BRYANT's** vehicle.

30

At approximately 3:57 p.m., however, TFO Woodard observed **BRYANT** depart the visitor parking lot and drive eastbound on Interstate 70. At approximately 4:14 p.m., GS Baratti observed **SMITH** as the passenger of **BRYANT's** vehicle and **BRYANT** as the driver. Shortly thereafter the vehicle arrived in the area of the Amtrak Station, located at 430 S 15th St., Saint Louis, MO. TFO Woodard observed **BRYANT's** vehicle pull into the passenger drop-off location; however, no one exited the vehicle. TFO Woodard observed **BRYANT's** vehicle depart the area shortly thereafter.

Surveillance units maintained surveillance of **BRYANT**; however, **BRYANT** began to circle numerous streets within the area as if checking to see if he was being followed. Surveillance of **BRYANT** was terminated at that time and surveillance was established at the Amtrak Station. Investigators continued to monitor electronic surveillance associated with **subject cellular telephones #1 and #2.**

At approximately 4:54 p.m., SA Carnucci and SA Kassouf observed **BRYANT's** vehicle arrive back at the Amtrak Station. SA Kassouf and SA Carnucci observed **SMITH** exit the passenger seat of **BRYANT's** vehicle, retrieve the aforementioned suitcases, and enter into the vestibule of the Amtrak Station. **BRYANT** departed the area at approximately 5:02 p.m.

Surveillance was terminated at that time.

At approximately 7:56 p.m., call session #1007, the CS sent a text message to **SMITH**, at **subject cellular telephone #1** stating, "U gone?..am already back in the house.cnt b out too late..old lady b tires so I got to get home to help early". **SMITH** replied at approximately 8:06 p.m., call session #1008, stating, "Ok, let me know when you are good again. My guy wants some oxtails." The CS acknowledged during call session #1010. The CS sent a text message to **SMITH**

31

at approximately 8:22 p.m., call session #1012, "Call me when u get there". **SMITH** texted the CS, call session #1014, "I will be back soon. Maybe drive down next week."   Additionally, **SMITH** texted the CS at approximately 8:24 p.m., call session #1018, stating, "They really want to start feeding the homeless people. Cost is a major concern though."   The CS asked **SMITH** at approximately 8:25 p.m., call session #1019, "How much a plate U think they can afford that I can stll see a profit". **SMITH** replied at approximately 8:26 p.m., call session #1020, "See you next week.".

Investigators believe that **SMITH** met with **SUNDAY** and **BRYANT** in reference to the purchase and/or transportation of narcotics.   Investigators also believe that due to the recent traffic stop of **SMITH's** Motor Coach, and the arrest of **BRYANT**, that they were discussing the next step they would take to obtain narcotics to continue with the drug trafficking organization. Additionally, based on information provided by the CS, including text messages **SMITH** sent to the CS, investigators believe "oxtails" refers to heroin.   Also, investigators believe that **SMITH's** statement that, "They really want to start feeding the homeless people. Cost is a major concern," actually refers to the drug trafficking organization trying to obtain narcotics, but not wanting to spend a lot of money because they lost a significant amount in seizures of money and narcotics.

Investigators believe that **SMITH** contacts **BRYANT** and/or **SUNDAY** only when it's related to narcotics activity and/or when **SMITH** is coming to Saint Louis to meet with **BRYANT** and/or **SUNDAY**.   Investigators believe **SMITH** will stay in communication with both **BRYANT** and **SUNDAY** and continue to travel to Saint Louis, MO to meet with and work with both **BRYANT** and **SUNDAY**.   With the assistance of the precision location information associated with **subject cellular telephones #1, #2 and #3,** investigators will be able to identify when and/or

32

if **SMITH** returns to Saint Louis, MO and meets with **BRYANT** and/or **SUNDAY**.   Furthermore, investigators continue to try to exploit this drug trafficking organization with the assistance of a confidential source and through physical and electronic surveillance of all known members of this organization.

Based upon my training and experience, I am aware that persons engaged in the illegal distribution of narcotics use cellular telephones in furtherance of their drug trafficking operations. Based upon the totality of this investigation, it is my opinion that there is probable cause to believe that **subject cellular telephones #1, #2 and #3** are being used in furtherance of drug trafficking activity, and that precision location information relative to **subject cellular telephones #1, #2 and #3** will further the investigation of the drug trafficking activities of **SMITH, BRYANT, SUNDAY** and their co-conspirators, including but not limited to, assisting in surveillance, determining the location of stash houses, and discerning other patterns of illegal drug trafficking activity.

The investigation has clearly demonstrated that **subject cellular telephones #1, #2 and #3** are being used in connection with the commission of offenses involving ongoing violations of Title 21, United States Code, Sections 846 and 841(a)(1) (the subject offenses).    It is critical that the investigative team be able to locate and monitor the movements of **subject cellular telephones #1, #2 and #3** thereby assisting in the identification of the co-conspirators and the seizure of narcotics. Your affiant believes that the requested authorization would be a valuable asset in achieving the overall goals of the investigation.

<u>**Investigative Considerations and Techniques**</u>

Based on my knowledge, training, and experience, as well as information provided by investigators with specialized experience relating to cellular telephone technology, I am aware of the following facts and considerations:

A.     Wireless phone providers typically generate and retain certain transactional information about the use of each telephone call, voicemail, and text message on their system. Such information can include log files and messaging logs showing all activity on a particular account, such as local and long distance telephone connection records, records of session times and durations, lists of all incoming and outgoing telephone numbers or other addressing information associated with particular telephone calls, voicemail messages, and text or multimedia messages.

B.     Wireless phone providers also typically generate and retain information about the location in which a particular communication was transmitted or received.   For example, when a cellular device is used to make or receive a call, text message or other communication, the wireless phone provider will typically generate and maintain a record of which cell tower(s) was/were used to process that contact.   Wireless providers maintain information, including the corresponding cell towers (i.e., tower covering specific geographic areas), sectors (i.e., faces of the towers), and other signaling data as part of their regularly conducted business activities.   Typically, wireless providers maintain records of the cell tower information associated with the beginning and end of a call.

C.     Because cellular devices generally attempt to communicate with the closest cell tower available, cell site location information from a wireless phone provider allows investigators

34

to identify an approximate geographic location from which a communication with a particular cellular device originated or was received.

D.      Wireless providers may also retain text messaging logs that include specific information about text and multimedia messages sent or received from the account, such as the dates and times of the messages.  A provider may also retain information about which cellular handset or device was associated with the account when the messages were sent or received.  The provider could have this information because each cellular device has one or more unique identifiers embedded inside it.  Depending upon the cellular network and the device, the embedded unique identifiers for a cellular device could take several different forms, including an Electronic Serial Number ("ESN"), a Mobile Electronic Identity Number ("MEIN"), a Mobile Identification Number ("MIN"), a Subscriber Identity Module ("SIM"), an International Mobile Subscriber Identifier ("IMSI"), or an International Mobile Station Equipment Identity ("IMEI").  When a cellular device connects to a cellular antenna or tower, it reveals its embedded unique identifiers to the cellular antenna or tower in order to obtain service, and the cellular antenna or tower records those identifiers.

E.      Wireless providers also maintain business records and subscriber information for particular accounts.  This information could include the subscriber's full name and address, the address to which any equipment was shipped, the date on which the account was opened, the length of service, the types of service utilized, the ESN or other unique identifier for the cellular device associated with the account, the subscriber's Social Security Number and date of birth, all telephone numbers and other identifiers associated with the account, and a description of the services available to the account subscriber.   In addition, wireless providers typically generate and

35

retain billing records for each account, which may show all billable calls (including outgoing digits dialed). The providers may also have payment information for the account, including the dates and times of payments and the means and source of payment (including any credit card or bank account number).

F.      Providers of cellular telephone service also typically have technical capabilities that allow them to collect and generate more precise location information than that provided by cell site location records. This information is sometimes referred to as E-911 phase II data, GPS data or latitude-longitude data. In the Eastern District of Missouri, such information is often referred to as "precision location information" or "PLI" data. E-911 Phase II data provides relatively precise location information about the cellular telephone itself, either via GPS tracking technology built into the phone or by attempting to triangulate the device's signal using data from several of the provider's cell towers. Depending on the capabilities of the particular phone and provider, E-911 data can sometimes provide precise information related to the location of a cellular device.

In order to locate **subject cellular telephone #2** and monitor the movements of the phone, the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, may need to employ one or more techniques described in this affidavit and in the application of the government. The investigative agency(ies), and other authorized federal/state/local law enforcement agencies, may seek a warrant to compel AT&T, any telecommunication service providers reflected in Attachment 1, to include providers of any type of wire and/or electronic communications (herein incorporated by reference), and any other applicable service providers, to provide precision location information, including Global Position System information (if

36

available), transactional records, including cell site location information, and pen register and trap-and-trace data.

None of the investigative techniques that may be employed as a result of the present application and affidavit require a physical intrusion into a private space or a physical trespass. Electronic surveillance techniques such as pen register and cell site location monitoring typically have not been limited to daytime use only. Furthermore, the criminal conduct being investigated is not limited to the daytime. Therefore, the fact that the present application requests a warrant based on probable cause should not limit the use of the requested investigative techniques to daytime use only. Accordingly, the investigative agency(ies), and other authorized federal/state/local law enforcement agencies, request the ability to employ these investigative techniques at any time, day or night.

The monitoring of the location of **subject cellular telephone #2** by one of the methods described herein will begin within ten (10) days of the date of issuance of the requested Warrant and Order.

## Conclusion

Based on the above information, there is probable cause to believe that **subject cellular telephone #2** is being used to promote and facilitate a conspiracy to distribute narcotics and the requested authorization would provide relevant evidence of the conspiracy. There is likewise probable cause to conclude that locating and monitoring the movements of **subject cellular telephone #2** will lead to the relevant evidence concerning violations of Title 21, United States Code, Sections 846 and 841(a)(1).

_____2/17/17_____
DATE

_____
MICHAEL CARNUCCI
Special Agent
Drug Enforcement Administration

Sworn to and subscribed before me this ____17____ day of February, 2017.

_____
PATRICIA L. COHEN
UNITED STATES MAGISTRATE JUDGE
Eastern District of Missouri

38

# LIST OF TELECOMMUNICATION SERVICE PROVIDERS

## AT&T

### and

| | | | |
|---|---|---|---|
| 01 Communications | Empire Paging | MCI Worldcom | Smart Beep Paging |
| Access Line Communication | Ernest Communications | Metro PCS | Smart City Telecom |
| ACN Communications | Echelon Telecommunications | Metro Teleconnect | Socket Telecom |
| ACS | EZ Talk Communications | Mid-Atlantic | South Central Bell |
| Aero Communications, Inc. (IL) | FDN Communications | Midvale Telephone Exchange | Sprint |
| Afford A Phone | Fibernit Comm | Midwest Wireless | Sprint Spectrum, L.P. |
| Airvoice Wireless | Florida Cell Service | Millington Telephone | SRT Wireless |
| Alaska Communications | Florida Digital Network | MLM Telecommunications | Star Telephone Company |
| Alhambra-Grantfx Telephone | Focal Communications | Mobile Communications | Start Wireless |
| AmeriTel | Frontier Communications | Mound Bayou Telephone Co. | Sugar Land Telephone |
| AOL Corp. | Gabriel Comm | Mountain Bell | Sure West Telephone Company |
| Arch Communication | Galaxy Paging | Mpower Communications | Talk America |
| AT&T | Global Communications | Navigator | Tele Touch Comm |
| AT&T Mobility | Global Crossing | Telecommunications | Telecorp Comm |
| Bell Aliant | Global Eyes Communications | NE Nebraska Telephone | Telepak |
| Big River Telephone | Global Naps | Netlink Comm | Telistire |
| Birch Telecom | Global Rock Network | Network Services | Telnet Worldwide |
| Blackberry Corporation | Grafton Telephone Company | Neustar | Tex-Link Comm |
| Brivia Communications | Grand River | Neutral Tandem | Time Warner Cable |
| Broadview Networks | Grande Comm | Nex-Tech/United Wireless | T-Mobile |
| Broadvox Ltd. | Great Plains Telephone | Nexus Communications | Total Call International |
| Budget Prepay | Harrington Telephone | NII Comm | Tracfone Wireless |
| Bulls Eye Telecom | Harrisonville Telephone Co. | North Central Telephone | Trinity International |
| Cable Vision | Heartland Communications | North State Comm | Triton PCS Company |
| Call Wave | Hickory Telephone | Northcoast Communications | U-Mobile |
| Cbeyond Inc. | Houston Cellular Telephone | Novacom | Unicel Cellular |
| CCPR Services | Huxley Communications | Ntera | United On-Line |
| Cellco Partnership, | iBasis | N-Teleos Wireless | United States Cellular Corp. |
| d/b/a Verizon Wireless | IDT Corporation | NTS Communications | United Telephone of MO |
| Cellular One | Illinois Consolidated | Oklahoma City SMSA | US Cellular |
| Cellular South | Communications | ONSTAR | US Communications |
| Centennial Wireless | Illinois Valley Cellular | Optel Texas Telecom | US LEC |
| CenturyLink | Insight Phone | Orion Electronics | US Link |
| Champaign Cellular | Integra | PacBell | US West Communcations |
| Charter Communications | Iowa Wireless | PacWest Telecom | USA Mobility |
| Chickasaw Telephone | IQ Telecom | PAETEC Communications | VarTec Telecommunications |
| Choctaw Telephone Company | J2 Global Communications | Page Plus Communications | Verisign |
| Choice Net Comm. | Leap Wireless International | Page Mart, Inc. | Verizon Telephone Company |
| Cimco Comm | Level 3 Communications | Page Net Paging | Verizon Wireless |
| Cincinnati Bell | Level One | Panhandle Telephone | Viaero Wireless |
| Cinergy Communications | Local Links Communications | Peerless Network | Virgin Mobile |
| Citizens Utilities | Locus Communications | Pineland Telephone | Vonage Holdings |
| Clear World Communication | Logix Communications | PhoneTech | Wabash Telephone |
| Com-Cast Cable Comm. | Longlines Wireless | PhoneTel | Weblink Wireless |
| Comm South Companies | Los Angeles Cellular | Preferred Telephone | Western Wireless |
| Commercial Communications | Madison River | Priority Communications | Westlink Communications |
| Consolidated Communications | Communications | Puretalk | Windstream Communications |
| Conversent Communications | Madison/Macoupin Telephone | RCN Telecom | WinStar Communications |
| Cox Communications | Company | RNK Telecom | Wirefly |
| Cricket Wireless | Mankato Citizens Telephone | QWEST Communications | WISPNET, LLC |
| Custer Telephone Cooperative | Map Mobile Comm | Sage Telecom | World Comm |
| DBS Communications | Marathon Comm | SE All-Tel Comm | XO Communications |
| Delta Communications | Mark Twain Rural | Seren Innovations | Xspedius |
| Detroit Cellular | Matrix Telecom, Inc. | Sigecom LLC | Yakdin Valley Telephone |
| Dobson Cellular | Max-Tel Communications | Sky Tel Paging | YMAX Communications |
| Egyptian Telephone | McCleod USA | | Ztel Communications |
| Electric Lightwave, Inc. | | | |

**ATTACHMENT 1, TO INCLUDE PROVIDERS OF ANY TYPE OF WIRE AND/OR ELECTRONIC COMMUNICATIONS**

Last Update: 08/17/2015